IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 33571-2-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 33624-7-III) |
| | ) | |
| v. | ) | |
| | ) | |
| LUIS GUADALUPE RODRIGUEZ-PEREZ, | ) | |
| | ) | |
| Appellant. | ) | OPINION PUBLISHED |
| | ) | IN PART |
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM ESCOBAR MARTINEZ, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, A.C.J. — Luis Guadalupe Rodriguez-Perez and William

Escobar Martinez, tried jointly, appeal their convictions. Both men were convicted of

second degree murder. Martinez was additionally convicted of unlawful possession of a

firearm.

Both men argue they are entitled to a new trial because of prosecutorial misconduct and error in the reasonable doubt instruction. Martinez asserts two additional arguments. He argues the trial court violated his right to present a defense when it excluded evidence that the shooting was gang related, and that he was not a gang member but Rodriguez-Perez was. He also argues the trial court erred by excluding testimony from his expert that casts doubt on cross racial identification.

We disagree with appellants' arguments and generally affirm. We publish in part to emphasize two aspects of our opinion. First, prosecutors should be very careful when adding commentary to PowerPoint slides used during closing argument. Commentary must be based on the evidence and assist the jury's understanding of it. Second, the right to present a defense is not absolute and, in appropriate cases, gives way to other legitimate interests, including a codefendant's right to a fair trial. Here, the trial court did not err in protecting codefendant Rodriguez-Perez's right to a fair trial by excluding evidence of his gang membership, even though such exclusion somewhat weakened Martinez's defense.

FACTS

In the early evening of March 22, 2014, Rodriguez-Perez, Martinez, and Efren Iniguez spent time together before attending a concert later that night at the Seasons Performance Hall in Yakima, Washington. The concert promoted local rap artists and singers. The trio got haircuts, returned to where Rodriguez-Perez and Iniguez lived, showered and dressed. Martinez borrowed red clothes from Rodriguez-Perez to wear. The trio enjoyed some tequila and smoked marijuana. Martinez noticed that Rodriguez-Perez had a gun in his waistband, the same gun he always carried with him. Rodriguez-Perez drove his friends to the event, and parked the car within two blocks of the venue. As the men approached the Seasons, they could observe security at the door using a wand to check concertgoers for weapons. Rodriguez-Perez turned away from the door and walked away. Minutes later Rodriguez-Perez returned and entered.

At some point during the event, 40 to 50 people abruptly went outside and many of them began to fight. An outside surveillance video showed Martinez running toward the parked car with Rodriguez-Perez seconds behind, walking toward the parked car. The video showed them, minutes later, walking back together toward the Seasons.

3

Back at the fight, Da'Marius Morgan punched Justin Navarro, also known as "Klick Klack"[1] in the head. Navarro fell down, but got back up. The two continued arguing. While they were arguing, three or more shots were fired by a third person at Morgan. One of the bullets pierced Morgan's heart and he died. A bullet also struck Isaiah Prince in the leg and wounded him. Prince could not identify who shot him or Morgan.

Estevan Montero was working security at the event and witnessed the shooting from inside the building. He saw three individuals near his truck, and one of them shot a handgun toward Morgan four or five times. The three men later were identified as Rodriguez-Perez, Martinez, and Iniguez. Montero saw Morgan collapse and fall, and the three men run away, down an alley.

Aaron Adams was also at the event. He saw a fight break out between two groups. Adams saw Morgan throw a punch and knock someone out. Adams saw two men run behind a truck, pull out firearms, fire at Morgan, and then run down a nearby alley.

Daniel Cerda was watching his son perform at the event and saw the fight and shooting. Cerda also saw the shooting, and saw the shooter run down the nearby alley.

---

[1] The transcript spells the pseudonym "Klick Klack," but the prosecutor directed multiple witnesses to designate the person as "CC" on illustrative diagrams.

William Telakish recorded much of the fight with his phone. The video showed Rodriguez-Perez, Martinez, and Iniguez just before the shooting standing where witnesses said the shooter or shooters stood. The Telakish video did not show who shot Morgan.

A second surveillance video showed Rodriguez-Perez, Martinez, and Iniguez running from the shooting toward an alley. It also showed Rodriguez-Perez tossing something into a bush.

Law enforcement arrived and began questioning witnesses. They quickly proceeded to the alley described by the witnesses, where they saw angry people yelling and running toward a bush. Two individuals began kicking two men who were crouched down and hiding in the bush. The officers pulled Rodriguez-Perez and Martinez out of the bush and took them into custody. While canvassing the scene, law enforcement found a black jacket, a white shirt, a red cap and a cell phone in the bushes where Rodriguez-Perez and Martinez were hiding.

At a show-up near the crime scene, Montero and Adams identified Martinez as the shooter, based on Martinez's distinctive hairstyle, hat, and clothing. But Adams also said that Rodriguez-Perez might be the shooter if he had been wearing a hat and subsequently discarded it. Cerda also identified Martinez as the shooter.

5

That night, law enforcement interviewed both suspects separately at the police station. Martinez said that Rodriguez-Perez was the shooter, and that the gun belonged to Rodriguez-Perez. Martinez played a video recording on his phone from one month earlier that showed Rodriguez-Perez pointing a gun at the camera.

The next morning, a man walking his dog found a gun in a bush near where officers had found Rodriguez-Perez and Martinez. Forensic tests established that the gun was the murder weapon. In addition, the gun's magazine had a fingerprint that matched Rodriguez-Perez's fingerprint.

PROCEDURE

The State charged Rodriguez-Perez and Martinez, both as principals and accomplices, with second degree murder of Morgan and first degree assault of Prince. The State also charged Martinez with first degree unlawful possession of a firearm.

On September 10, 2014, the State requested consolidation of the cases. At the same hearing, Rodriguez-Perez and Martinez moved the court to sever their trials. In their motions, the men argued that their defenses were mutually antagonistic. The State responded that the defenses were not mutually antagonistic because Martinez would argue Rodriguez-Perez was the shooter, while Rodriguez-Perez would argue the shooter was a

6

third person. The trial court agreed with the State that the defenses were not sufficiently antagonistic for severance purposes, and granted consolidation.

On February 24, 2015, Rodriguez-Perez made motions in limine. One of the motions asked the trial court to exclude gang evidence. The State agreed that gang evidence was not relevant. Martinez reserved on the issue after indicating he might go either direction.

During a later hearing, Martinez sought an order allowing Dr. Geoffrey Loftus to testify about the unreliability of eyewitness identification. The trial court generally allowed Dr. Loftus to testify, but did not allow him to testify on the narrow issue of cross racial eyewitness identification.

Trial commenced with jury selection on March 5, 2015. Opening statements were made on March 9, 2015. The State then began presenting its case.

On March 16, 2015, during a short break in the State's case, Martinez addressed the gang evidence issue that he previously reserved. Martinez indicated he now wanted to admit gang evidence. He argued that one security guard indicated the fight was between two rival gangs, the Fun Boys and the West Side Hustlers. The guard indicated he saw Morgan punch Navarro, a rapper affiliated with the Fun Boys, causing Navarro to fall to the ground, and then someone from the Fun Boys fired shots at Morgan. Continuing,

Martinez added that Sergeant Cortez would testify that Rodriguez-Perez was a member of the Fun Boys, and would also testify that he (Martinez) was not a known gang member. Rodriguez-Perez objected, and said the security guard, who previously testified, did not testify it was gang related. The trial court reserved ruling on the issue.

On March 27, 2015, the State rested. Rodriguez-Perez and Martinez renewed their motions to sever. Pursuant to CrR 4.4(a)(2), their renewed motions were limited to the grounds they previously argued. Both defendants generally argued that severance was required because their defenses were mutually antagonistic. The trial court again denied their motions to sever.[2]

The trial court next addressed the outstanding motion in limine pertaining to the admission of gang evidence. The trial court directed Martinez to make an offer of proof. Martinez's offer of proof was similar to the previous offer, and is set out in detail later in this opinion. After hearing the offer of proof, the trial court excluded gang evidence on the basis that Martinez had failed "to establish that the shooting was to advance a particular gang purpose or value." 15 Report of Proceedings (RP) (Mar. 27, 2015) at

_____

[2] Martinez very briefly argued a new reason for severance, that he wanted to admit gang evidence that the shooting was gang related, and that Rodriguez-Perez was a Fun Boys member. The trial court, perhaps aware of CrR 4.4(a)(2), separated the severance issue from the newly raised gang evidence issue. Martinez does not assign error to this nor does either defendant challenge the trial court's denial of their severance motions.

8

2861. The trial court additionally reasoned that admitting gang evidence would be unfairly prejudicial to Rodriguez-Perez.

Martinez then testified in his own defense. He testified that Rodriguez-Perez owned the gun that shot Morgan, and that Rodriguez-Perez was the shooter. Martinez also testified he did not know that Rodriguez-Perez had a gun until he shot Morgan. He further testified he did not do or say anything that encouraged or helped Rodriguez-Perez shoot Morgan. In accordance with the trial court's ruling, Martinez did not testify about Rodriguez-Perez's gang affiliation or about his own lack of gang affiliation.

The trial court then instructed the jury. The reasonable doubt instruction, objected to by both Rodriguez-Perez and Martinez, stated:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

Clerk's Papers (CP) (Martinez) at 327.

In closing arguments, the State used a PowerPoint presentation to summarize the evidence presented to the jury over the previous three weeks. The PowerPoint presentation consisted of photographs, frames of videos, and summaries of Martinez's testimony—all of which were admitted at trial. Each PowerPoint slide had a caption that

9

described the contents of the slide, and the slides that summarized Martinez's testimony included editorial comments. Neither Rodriguez-Perez nor Martinez objected to these captions or editorial comments during closing arguments.

The jury found both men guilty of second degree murder. The jury also found Martinez guilty of unlawful possession of a firearm. At sentencing, the trial court told the two men that it was waiving discretionary legal financial obligations because they both were indigent. The trial court struck costs of incarceration for Martinez, but failed to strike costs of incarceration for Rodriguez-Perez. Both men appealed, and we consolidated their appeals.

## ANALYSIS

### A.   PURPORTED PROSECUTORIAL MISCONDUCT

Rodriguez-Perez and Martinez contend the prosecutor committed misconduct by using inflammatory captions on his PowerPoint presentation during closing arguments. Martinez separately contends that some of the slides improperly commented on his credibility. Rodriguez-Perez also separately contends that the prosecutor committed misconduct by improperly vouching for Martinez's testimony. We disagree with all of these contentions.

10

To show prosecutorial misconduct, the defendant has the burden of establishing that (1) the State acted improperly, and (2) the State's improper act prejudiced the defendant. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Misconduct is prejudicial if there is a substantial likelihood it affected the verdict. *Id.* at 760-61. A prosecutor commits misconduct by personally vouching for a witness's credibility. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). The State has wide latitude in drawing and expressing reasonable inferences from the evidence, including inferences about credibility. *State v. Thompson*, 169 Wn. App. 436, 496, 290 P.3d 996 (2012). Courts review allegations of prosecutorial misconduct during closing argument in light of the entire argument, the issues in the case, the evidence discussed during closing argument, and the court's instructions. *State v. Sakellis*, 164 Wn. App. 170, 185, 269 P.3d 1029 (2011).

However, a defendant who fails to object to the State's improper act at trial waives any error, unless the act was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). In making that determination, the courts "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Emery*, 174 Wn.2d at 762.

11

*1.    The prosecutor did not improperly vouch for Martinez*

Improper vouching occurs if the prosecutor (1) places the prestige of the government behind the witness, or (2) indicates that evidence not presented at trial supports the witness's testimony. *State v. Robinson*, 189 Wn. App. 877, 892-93, 359 P.3d 874 (2015). Rodriguez-Perez contends the State vouched for Martinez because it claimed in its opening statement that Martinez was the shooter, but during closing adopted one of Martinez's contentions that Rodriguez-Perez was the shooter. Rodriguez-Perez's argument is that by changing its theory and adopting one of Martinez's contentions, the prosecutor placed the prestige of the government behind Martinez. The prosecutor's closing, considered as a whole, does not support this argument.

During closing, the prosecutor argued two alternative theories. One theory was based on witness identification and argued that Martinez was the shooter. The other theory was based on the physical evidence that the gun belonged to Rodriguez-Perez, that the gun's magazine had Rodriguez-Perez's fingerprint, and that Rodriguez-Perez possessed the gun soon after the shooting and then threw it into a bush. This second theory was buttressed by Martinez's testimony that Rodriguez-Perez was the shooter. In arguing this second theory, the prosecutor emphasized that the jury should still find Martinez guilty as an accomplice.

12

But the prosecutor did not put the prestige of the government behind Martinez. Although the prosecutor's second alternative argument in closing was consistent with Martinez's testimony that he was not the shooter, the prosecutor disagreed with Martinez's testimony much more than he agreed with it. During closing, the prosecutor repeatedly emphasized portions of Martinez's testimony that the jury should not believe. For example, the prosecutor emphasized that Martinez was lying about not knowing why Rodriguez-Perez delayed entering the Seasons, was lying about why he ran to the parked car when the fight began, and was lying about his claimed ignorance that Rodriguez-Perez had a gun with him before Rodriguez-Perez shot Morgan. Because the prosecutor's argument did not put the weight of the government behind Martinez's testimony, we conclude the prosecutor did not improperly vouch for Martinez.

> 2. *The prosecutor did not improperly comment on Martinez's credibility*

A prosecutor may comment on a witness's veracity as long as a personal opinion is not expressed and as long as the comments are not intended to incite the passion of the jury. *State v. Stith*, 71 Wn. App. 14, 21, 856 P.2d 415 (1993). There is a difference between the prosecutor's personal opinion, as an independent fact, and an opinion based on or deduced from the evidence. *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006) (quoting *State v. Armstrong*, 37 Wash. 51, 54-55, 79 P. 490 (1905)). Misconduct

13

occurs only when it is clear and unmistakable that the prosecutor is not arguing an

inference from the evidence, but is expressing a personal opinion. *Id.* at 54 (quoting *State*

*v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)). Martinez argues the

prosecutor improperly commented on his credibility in PowerPoint slides 44, 47, 50, and

56.

The slides, depicted below, contain Martinez's testimony in regular type, and the

State's editorial comments and contrary assertions in italics:

### WILLIAM MARTINEZ
- [Rodriguez-Perez] had pistol in waistband at house before concert
- Drank tequila
- Smoked marijuana
- Drove to concert
- Parked car on Naches Avenue
- Wanded for weapons at door
- [Rodriguez-Perez] did not enter; left for 5 minutes
- Did not know why [Rodriguez-Perez] went back (not credible)
- Jury instruction: You are the sole judges of the credibility of each witness. ... In considering a witness's testimony, you may consider these things: . . . any *personal interest* that the witness might have in the outcome or the issues; . . . the *reasonableness* of the witness's statements in the context of all of the other evidence;
- *[Martinez] knew why [Rodriguez Perez] left—to put the pistol back in the car!*

Ex. SE-A at 44.

## WILLIAM MARTINEZ

- Watched concert
- Went outside
- Saw fight
- Walked to car
- *Ran to car! (video)*
- Did not know where [Rodriguez-Perez] was
- *[Rodriguez-Perez] was seconds behind [Martinez] heading for car! (video)*
- Jury instruction: You are the sole judges of the credibility of each witness. ... In considering a witness's testimony, you may consider these things: . . . any *personal interest* that the witness might have in the outcome or the issues; ... the *reasonableness* of the witness's statements in the context of all of the other evidence;
- *[Martinez] and [Rodriguez Perez] went together to get the pistol from the car.*

Ex. SE-A at 47.

## WILLIAM MARTINEZ

- Car locked
- Talked with girls
- Heard car alarm
- Saw [Rodriguez-Perez] inside car
- Touched [Rodriguez-Perez] on shoulder
- [Rodriguez-Perez] (*best friend*) ignores [Martinez]; leaves the car
- [Martinez] calls out for [Rodriguez-Perez]
- [Rodriguez-Perez] doesn't answer or look back
- [Martinez]: Does not know that [Rodriguez-Perez] got gun
- Jury instruction: You are the sole judges of the credibility of each witness. ... In considering a witness's testimony, you may consider these things: . . . any *personal interest* that the witness might have in the outcome or the issues; ... the *reasonableness* of the witness's statements in the context of all the other evidence;

15

- [*Martinez*] *knew that* [*Rodriguez Perez*] *got the pistol;* [*Martinez*] *helped* [*Rodriguez-Perez*] *get pistol.*

Ex. SE-A at 50.

## WILLIAM MARTINEZ

- Best friends
- Saved money for [Rodriguez-Perez] at bank
- Wore [Rodriguez-Perez]'s red shirt and shoes
- [Rodriguez-Perez] carried pistol every time [Martinez] saw him
- Videoed [Rodriguez-Perez] pointing pistol ("Good times")
- [Rodriguez-Perez] has pistol in waistband earlier that night
- Ran back to car just ahead of [Rodriguez-Perez]
- Saw [Rodriguez-Perez] get something from backseat of car
- Went back to Pendleton Way with [Rodriguez-Perez]
- Stood behind orange [truck] with [Rodriguez-Perez]. "I was right up front where that fool was."
- *Didn't know that* [*Rodriguez-Perez*] *intended to fire?*

Ex. SE-A at 56.

What is evident from the slides, combined with the prosecutor's arguments, is that the prosecutor was arguing that portions of Martinez's testimony should not be believed *because* of the existence of contrary evidence. The prosecutor repeatedly referred the jury to Martinez's testimony and evidence that contradicted his testimony. And in doing so, the prosecutor repeatedly emphasized that the jurors were the sole judges of credibility. For example, with respect to slide 44, the prosecutor argued:

16

Mr. Martinez says he didn't know why [Rodriguez-Perez did not initially enter the Seasons]. I would suggest to you that this part of Mr. Martinez's testimony is not credible. You have a jury instruction that states in part that you are the sole judges of the credibility of each witness. In considering a witness' testimony, you may consider these things, and one of those things is any personal interest that the witness might have in the outcome of the issues, the reasonableness of the witness' statements in the context of all the other evidence.

I suggest to you that this portion of Mr. Martinez's testimony where he says that he did not know why [Rodriguez-Perez] went away from the door is not credible. He has a personal interest in the outcome of this proceeding. When you consider all the other evidence, the statement is not reasonable.

Mr. Martinez knew exactly why [Rodriguez-Perez] left the door of The Seasons Performance Hall because he couldn't get inside with the gun that was in the waistband of his [pants], the gun he always carried, the gun that was in the waistband of his pants just before they left . . . the house.

17 RP (Mar. 31, 2015) at 3297. From the context, it is clear throughout closing argument the prosecutor was asking the jury to doubt portions of Martinez's testimony *because* of conflicting evidence. Because the prosecutor's comments about Martinez's credibility were based on the evidence and not the prosecutor's personal opinion, we conclude the prosecutor did not commit misconduct in this regard.

> 3. *The captions on the PowerPoint slides generally reflected the evidence or reasonable inferences therefrom*

Rodriguez-Perez and Martinez argue the prosecutor committed prejudicial misconduct when he used PowerPoint slides to add captions and various editorial

17

comments to evidence admitted at trial. They argue prosecutorial misconduct occurs whenever the prosecutor uses PowerPoint slides to alter evidence. We disagree.

Rodriguez-Perez and Martinez rely heavily on *In re the Personal Restraint of Glasmann*, 175 Wn.2d 696, 286 P.3d 673 (2012). In that case, the prosecutor used PowerPoint slides to assist in closing arguments. *Id.* at 701. The slides contained photographs and surveillance camera footage introduced at trial, altered to include captions. *Id.* At least five slides showed Glasmann's battered face from his booking photograph. *Id.* at 701-02. One booking photo slide had a caption which read, "'DO YOU BELIEVE HIM?'" *Id.* at 701. Another booking photo slide had a caption which read, "'WHY SHOULD YOU BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?'" *Id.* at 701-02. Toward the end of the PowerPoint, there was a series of three booking photos. *Id.* at 702. The first had the word "'GUILTY'" in red emblazoned diagonally across Glasmann's battered face. *Id.* The second had the word "'GUILTY'" in red superimposed mirror-like over the previous slide so that the words formed an "'X'" over Glasmann's face. *Id.* The third had the word "'GUILTY'" in red superimposed horizontally over the previous slide, in effect, saying, "'GUILTY, GUILTY, GUILTY.'" *Id.* at 714. In a plurality decision, the court reversed all of Glasmann's four convictions and granted him a new trial.

18

The four justices in the plurality seemingly agreed that altering evidence by adding editorial comment to PowerPoint slides *is* prosecutorial misconduct. *Id.* at 705-07. The four dissenting justices agreed that the PowerPoint captions were improper, but would have affirmed three of the four convictions on the basis that the improper closing was not prejudicial as to those convictions. *Id.* at 718. Of significance here, the four dissenting justices did not construe the plurality's holding as prohibiting PowerPoint slides, provided that the slides and arguments were proper. *Id.* at 724.

The pivotal vote for the plurality was the concurring opinion of Justice Chambers. Justice Chambers described the line between proper and improper use of PowerPoint in closing:

> Certainly, lawyers may and should use technology to advance advocacy and judges should permit and even encourage new techniques. *But we must all remember the only purpose of visual aids of any kind is to enhance and assist the jury's understanding of the evidence.* Technology should never be permitted to dazzle, confuse, or obfuscate the truth. The jury's deliberations must be based solely upon the evidence admitted and the court's instructions, not upon whose lawyer does the best job of manipulating, altering, shuffling, or distorting the evidence into some persuasive visual kaleidoscope experience for the jury.

*Id.* at 715-16 (emphasis added). Thus, a majority of justices in *Glasmann* agreed that counsel may use PowerPoint slides and editorialize, provided that in doing so, editorial comments are based on the evidence and assist the jury's understanding of it.

Here, the prosecutor's PowerPoint slides contained editorial comments in the form of captions. These captions were directly linked to the evidence and were helpful to the jury's understanding of it. Examples of captions include: "COBAN SHOWUP," "HAT BEHIND BUSH," or "RODRIGUEZ-PEREZ WEARING HAT." Ex. SE-A at 30-36. Other challenged captions described what was occurring in still-shots of the various surveillance videos displayed to the jury: "MARTINEZ RUNS TO CAR FOR PISTOL," "RODRIGUEZ-PEREZ HEADING TO CAR FOR PISTOL," "MARTINEZ RETURNS FROM CAR," or "BACK AT THE FIGHT." Ex. SE-A at 48-54. No slide has a caption even remotely comparable to those in *Glasmann*.

But there is one slide that we do find disconcerting. Slide 43 is captioned, "GOOD TIMES." Ex. SE-A at 43. The slide is an exhibit photograph of Martinez slumped in a chair, with a dazed expression. It was taken at the same place and time as slide 42, which depicts Rodriguez-Perez pointing the murder weapon at the camera. Ex. SE-A at 42. Martinez argues the prosecutor deliberately designed the caption to prejudice him. The State responds that the caption reflects Martinez's own description of those two photographs.

Martinez testified that he took the photographs in slides 42 and 43, and also why he saved them: "I just wanted to save it just for good times, just remember us three, just a

20

good time." 15 RP (Mar. 27, 2015) at 2964. Although the State's response has a basis in fact, the prosecutor's choice of caption—Good Times—and Martinez's dazed expression, combine to cause the State's response to ring hollow.

Although we find the caption improper, we do not find it prejudicial under the applicable standard. The prejudice element of a defendant's claim of prosecutorial misconduct requires the defendant to show a substantial likelihood that the misconduct affected the jury's verdict. *Glasmann*, 175 Wn.2d at 704. The expression on Martinez's face in the photograph was part of the record before the prosecutor called additional attention to it with the caption. In addition, Martinez testified that he and his two friends drank tequila and smoked marijuana before the concert. The caption "Good Times" implies an irrelevant fact admitted by Martinez. We cannot find that the caption, itself, affected the jury's verdict. Finally, the prosecutor's closing argument focused on the evidence, not on Martinez's dazed expression. We are confident that the jury's deliberations were similarly focused.

B.    MARTINEZ'S RIGHT TO PRESENT A DEFENSE

Martinez separately contends the trial court violated his right to present a defense by excluding evidence of gang affiliation and expert witness testimony about the unreliability of cross racial eyewitness identification.

21

This court reviews a claim of a denial of Sixth Amendment to the United States Constitution rights de novo. *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). "We continue to review most trial court evidentiary rulings for an abuse of discretion." *State v. Duarte Vela*, 200 Wn. App. 306, 317, 402 P.3d 281 (2017). "But when a trial court's discretionary ruling excludes relevant evidence, the more the exclusion of that evidence prejudices an articulated defense theory, the more likely we will find that the trial court abused its discretion." *Id.* (citing *Jones*, 168 Wn.2d at 720).

Both the United States and the Washington State Constitutions guarantee the right to present testimony in one's defense. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Hudlow*, 99 Wn.2d 1, 14, 659 P.2d 514 (1983). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). A defendant's right to an opportunity to be heard in his defense, including the rights to examine witnesses against him and to offer testimony, is basic in our system of jurisprudence. *Jones*, 168 Wn.2d at 720. "Evidence that a defendant seeks to introduce 'must be of at least minimal relevance.'" *Id.* (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). Defendants have a right to present only relevant evidence, with no constitutional right to present irrelevant evidence.

*State v. Gregory*, 158 Wn.2d 759, 786 n.6, 147 P.3d 1201 (2006). If relevant, the burden

is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-

finding process at trial. *Darden*, 145 Wn.2d at 622.

> *1.    Gang affiliation evidence*
>
> > *a.    The trial court did not consider judicial economy in limiting gang evidence*

One of Martinez's arguments is that the trial court erroneously prioritized judicial

economy over his right to present gang evidence. We disagree.

During the hearing on the initial motions to sever, the trial court denied the

motions after analyzing whether the two defenses were mutually antagonistic. Martinez's

theory of defense was Rodriguez-Perez was the shooter, while Rodriguez-Perez's theory

was neither he nor Martinez shot Morgan or Prince. The trial court concluded that these

defenses were not sufficiently antagonistic to warrant severance.

After the State rested, and pursuant to CrR 4.4(a)(2), the trial court considered the

defendants' renewed motions to sever on the same ground they previously argued. The

trial court analyzed the issue on the record, cited authorities that supported its ruling, and

reached the same conclusion that severance was not warranted.

After the trial court denied the motions to sever, it then addressed gang evidence. Our review of the record shows no support for Martinez's contention that the trial court considered judicial economy as a reason for excluding gang evidence.

> b.    *Evidence of gang affiliation was somewhat relevant, but excludable on the basis that it was highly prejudicial to Rodriguez-Perez*

All relevant evidence is admissible. ER 401. However, before gang evidence is relevant, the party seeking admission must show a nexus between gang membership and the charged crime. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009). After that connection is shown, gang evidence still falls within the scope of ER 404(b). *State v. Yarbrough*, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith, but it is admissible to establish motive. ER 404(b). Here, a portion of Martinez's defense was that he did not have a motive to shoot or participate in the shooting of Morgan, but Rodriguez-Perez, a member of the Fun Boys, did have such a motive.

24

The trial court asked Martinez for an offer of proof on the gang affiliation evidence he wished to introduce. The offer, based on Sergeant Cortez's police report/interview with security guard Martin Gonzalez,[3] stated:

> [The fight] began inside during the concert when several subjects began to exchange words for an unknown reason but thought it had something to do with gangs or rap. Gonzalez explained that there were several rap groups playing [that night], that one of rap [groups] named DSB, Down Since Birth, is affiliated with the FB's, Fun Boys, a Norteno gang in Yakima.
>
> Gonzalez stated that two large groups that consisted of West Side Hustlers and FB's, Fun Boys, went outside to rumble and square off. Gonzalez stated that he was standing at the entrance door, which they locked to prevent the fight from going into the business, and was looking through the glass when the two groups began to fight.
>
> Gonzalez stated they fought for a moment and then stopped but continued to exchange words. Gonzalez stated a short time later it appeared to get started. A subject with the West Side Hustlers threw a punch at Klick Klack, Justin Navarro, date of birth 6-30-91, who's an FB rapper.
>
> Gonzalez stated as the fight was beginning again a subject that was with the FB's brandished a pistol and shot about three times. Gonzalez stated he did not know if the subject was shooting at anyone in particular or just into the crowd.
>
> So the significance from [Martinez's] perspective is that Mr. Gonzalez specifically indicates that this was, at least as I interpret this language, a gang-reported incident between West Side Hustlers and Fun Boys, two rival gangs. He identified the person he saw as the shooter as being somebody who was a Fun Boy.

---

[3] Gonzalez testified that he attended a nearby university, was studying criminal justice, and his prior work experience included working for two local security companies. He further testified that a friend asked him to work security for the event, and that he worked as a volunteer. The record says nothing about Gonzalez's training and background for identifying gang affiliations.

15 RP (Mar. 27, 2015) at 2857-58. The offer also stated that Sergeant Cortez would testify that Rodriguez-Perez was a high-ranking member of the Fun Boys, and that Martinez was not known to be a gang member.

The trial court analyzed the issue under *Scott* and excluded the evidence for lacking a nexus between gang values or purpose and the charged crime. Specifically, the court noted, "[t]he evidence so far indicates that the shooting arose out of a conflict between two groups, which started out as yelling and rose to the level of a fistfight. There is simply not enough evidence in this case to establish that the shooting was to advance a particular gang purpose or value." 15 RP (Mar. 27, 2015) at 2861.[4] As an additional basis for its ruling, the trial court opined that admission of gang evidence was unfairly prejudicial to Rodriguez-Perez. We agree with this alternative basis and limit our disposition of the issue accordingly.

As previously explained, a defendant's right to present evidence is not absolute. It may, "in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers*, 410 U.S. at 295. The First Amendment right of association protects gang affiliation. *Scott*, 151 Wn. App. at 526 (citing *Dawson v. Delaware*, 503

---

[4] Up to that point, the parties intentionally omitted gang evidence from the trial. So the trial court's reasoning was a bit tautological. The trial court should have focused on the offer of proof, not the evidence that it had already heard.

26

U.S. 159, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992)). The admission of gang evidence is highly prejudicial. *State v. Asaeli*, 150 Wn. App. 543, 579, 208 P.3d 1136 (2009). Admitting gang evidence risks a jury convicting a person solely on the basis of gang membership. *See Scott*, 151 Wn. App. at 529. Recognizing this danger, the State agreed with Rodriguez-Perez that evidence of gang membership was not admissible. Martinez equivocated on the admission of gang evidence until one week into the trial.

Martinez had a very good reason to equivocate. Had the trial court admitted gang evidence, Martinez would have had an additional problem: how would he explain his request to wear Rodriguez-Perez's red Fun Boys/Norteno-colored clothing to the concert. Having an officer testify that Martinez was not a *known* gang member was of little help, given Martinez's request of his high-ranking gang member friend to wear his gang-colored clothing. Because admitting gang evidence would have jeopardized Rodriguez-Perez's right to a fair trial, and might have hurt Martinez's case more than it helped it, we cannot say that the trial court's exclusion of gang evidence was an abuse of discretion.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

27

### 2. *Expert testimony on cross racial eyewitness identification*

Martinez argues the trial court violated his right to present a defense by excluding his expert, Dr. Geoffrey Loftus, from testifying about the unreliability of cross racial identification.

All relevant evidence is admissible, absent some exceptions. ER 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." ER 702. In the case of scientific testimony, the expert (1) must qualify as an expert, (2) the expert's opinion must be based on a theory generally accepted in the relevant scientific community, and (3) the testimony must be helpful to the trier of fact. *State v. Allery*, 101 Wn.2d 591, 596, 682 P.2d 312 (1984).

When "eyewitness identification of the defendant is a key element of the State's case, the trial court must carefully consider whether expert testimony on the reliability of eyewitness identification would assist the jury in assessing the reliability of eyewitness

28

testimony." *State v. Cheatam*, 150 Wn.2d 626, 649, 81 P.3d 830 (2003). "[T]he court should consider the proposed testimony and the specific subjects involved in the identification to which the testimony relates, such as whether the victim and the defendant are of the same race, whether the defendant displayed a weapon, [and] the effect of stress . . . ." *Id.*

Martinez is Hispanic. The only non-Hispanic eyewitness who identified Martinez as the shooter is Adams. Dr. Loftus generated a report, and the report noted Adams did not identify Martinez to the police based on race, "he said that shooter . . . had a red shirt and a red hat, and, he had a sweater. [Adams] couldn't see the color of the sweater . . . . He says he's 100% sure of the guy he picked (Martinez) because he had the 'exact same color of hat.'" CP (Martinez) at 180-81. Martinez conceded in oral argument that Adams "picked Mr. Martinez primarily because he was dressed all in red. So it was based on clothing that he was making his identification." RP (Mar. 2-3, 2015) at 51.

The record is clear that Adams identified Martinez based on his clothing rather than because of any racial characteristic. The trial court correctly concluded that expert testimony on cross racial identification would not assist the jury. The trial court did not violate Martinez's right to present a defense when it excluded irrelevant evidence. *Gregory*, 158 Wn.2d at 786 n.6.

C.    REASONABLE DOUBT JURY INSTRUCTION

Rodriguez-Perez and Martinez contend the trial court impermissibly lowered the

State's burden of proof by giving the jury a probable cause instruction that contained the

phrase "abiding belief in the truth of the charge." Each opposed the State's request for

this instruction. We disagree.

This court reviews a challenge to the language of jury instructions de novo,

considering the context of the instructions de novo. *State v. Bennett*, 161 Wn.2d 303,

307, 165 P.3d 1241 (2007). The language in question comes from the Washington

Pattern Instructions and has survived a number of similar challenges. 11 WASHINGTON

PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 93 (4th ed.

2016); *see State v. Kinzle*, 181 Wn. App. 774, 784, 326 P.3d 870 (2014); *State v.*

*Fedorov*, 181 Wn. App. 187, 200, 324 P.3d 784 (2014); *State v. Pirtle*, 127 Wn.2d 628,

658, 904 P.2d 245 (1995); *State v. Mabry*, 51 Wn. App. 24, 25, 751 P.2d 882 (1988). The

United States Supreme Court has also upheld the use of an abiding belief instruction.

*Victor v. Nebraska*, 511 U.S. 1, 14-15, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994).

Nonetheless, Rodriguez-Perez and Martinez argue the instruction is no longer

permissible after *Emery*. We disagree. Although the trial court gave the same

instruction, the issue in *Emery* was much narrower. In *Emery*, the prosecutor repeatedly

30

implored the jury during closing argument to speak the truth. *Emery*, 174 Wn.2d at 751. Our Supreme Court found the *statement* improper and reasoned, "a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt," not to speak or declare the truth. *Id.* at 760. Nothing in the holding disturbed prior precedent pertaining to the phrase "abiding belief in the truth" or its use in a reasonable doubt jury instruction. *See State v. Giles*, 185 Wn. App. 1038, *review denied*, 184 Wn.2d 1021, 361 P.3d 747 (2015). Here, the instruction correctly invited the jury to weigh the evidence.

D.    LEGAL FINANCIAL OBLIGATIONS

Rodriguez-Perez contends that a scrivener's error in the judgment and sentence obligated him to pay costs of incarceration, when the trial court intended to waive these costs for both Martinez and him. The State concedes this point and agrees that remand is appropriate for the trial court to correct this error. We accept the concession and remand for the trial court to strike Rodriguez-Perez's costs of incarceration.

E.    APPELLATE COSTS

Martinez and Rodriguez-Perez ask this court not to impose appellate costs in the event they do not prevail. The State responds by agreeing not to seek appellate costs. We therefore decline to impose costs. RAP 14.2.

31

Affirm, but remand to strike incarceration costs.

Lawrence-Berrey, A.C.J.

Korsmo, J.

Siddoway, J.